## Mistelske v. Kravco, Inc.

Before Smart, Adams, and Kennedy, JJ.

*Frank R. Bolte,* for plaintiff.

*Joseph F. Weis* and *Sherriff, Lindsay, Weis & McGinnis,* for defendant.

KENNEDY, J., July 3, 1953.—Raymond C. Mistelske, plaintiff, a paid fireman for the City of Pittsburgh,

sued defendants for injuries he sustained while assisting in putting out a fire in a building owned or controlled by them. He claimed that the injuries resulted from an extra hazardous condition which defendants knew, or should have known, existed in the building prior to the fire. There was not sufficient evidence submitted to show any actionable liability by the partnership defendant, and a directed verdict in their favor was given by the trial court. The jury returned a verdict in favor of corporate defendant, Kravco, Inc. Plaintiff, by his counsel, moved for a new trial and it is the disposition of this motion that is now before us.

The reasons for a new trial pressed at the oral argument and consolidated in plaintiff's brief are as follows:

1. The verdict of the jury was against the weight of the evidence (reasons 1 and 2 in motion for new trial).

2. The court erred in refusing to admit certain opinions which were offered in support of plaintiff's case (reasons 4 and 5 in motion).

3. The court committed fundamental error in law as to the basis of liability in its charge (reasons 3, 7, 8 and 9 in motion).

The testimony discloses that a fire broke out in an old four-story brick building known as 625 Smithfield Street, at about 2:30 a.m., December 18, 1947. Plaintiff's fire company, with other companies, was called to the fire. The fire at the time appeared to be limited to the second, third and fourth floors. Plaintiff, with two other firemen, was stationed in a hallway at the rear of the building near a staircase leading to the second floor, with orders to play the fire hose up the staircase into the second floor. While so engaged, plaintiff was struck on his fire helmet by some falling object which caused him to be knocked in a prone

position. It is claimed that this falling object then came in contact with his right leg breaking the femur near the knee joint, and also the ankle bone. At the place where the plaintiff was hurt there was found lying in the debris a steel elevator counterbalance to which was attached a ⅝ inch steel cable. The hospital records however disclose that the injuries sustained by plaintiff were the result of a staircase giving way while plaintiff and others were standing on it, and that the hose nozzle struck and broke his leg. The fire chief on duty testified that this steel counterbalance, to which was attached a steel cable, was partly on plaintiff's body and was 27 inches long and quite heavy. He gave no other dimensions.

Plaintiff's theory as to what caused this elevator counterbalance to fall comes mostly from a fire department investigator, one Joseph A. Pitacciato, who arrived at the scene of the fire about 8:30 a.m., after the fire had been put out. He testified that at one time there had been an elevator in this building, but that it had been abandoned many years prior to the fire, and that the old elevator shaft was used to place a staircase to the second floor, and boarded over on the third and fourth floors. He further said that there was an elevator cable drum close to the ceiling of the third floor to which the counterbalance steel rope cable was still attached; that above this drum the cable ran along the side of a joist, through a hole to the fourth floor, and then up to a roof penthouse, and over a shive wheel; that around the cable at the joist there were large nails bent like staples, presumably to anchor and hold fast the cable at this place. He *assumed* that the counterbalance was resting on the fourth floor with part of its weight at one time being partly supported by the anchored cable. It was his theory that the nails did not continue to serve the purposes for which they were driven around the cable at the

joist, with the result that the fourth floor later carried the complete weight. He stated there was a hole through the fourth floor "cut out" about the size of the counterbalance. He further stated that this counterbalance was 6 feet long, 24 inches wide and 6 inches thick; and that there was some "splintering" of the fourth floor wood surface near this hole. His assumption therefore was that the flooring became weakened from bearing the whole burden of the counterbalance standing in an upright position, and based on the dimensions given by him, weighing approximately 4,500 pounds, broke through the fourth floor, through the third floor, and down to the first floor where it landed near the steps where plaintiff was working, with the steel cable still attached to it.

There was some opinion testimony from a consulting constructing engineer that such a gradual weakening of the wooden floor could occur. This witness was rather indefinite as to whether or not the gradual weakening could be ascertained by a normal inspection, or when, if ever the floor became so weakened, that the counterweight would break through.

The defense denied that this counterbalance ever was located in an upright position on the fourth floor, and called numerous witnesses to support that contention.

The partnership defendant had either owned or occupied the adjoining four-story brick building known as 623 Smithfield Street for many years. They were engaged in the manufacturing and retailing of luggage in this building. In 1938 they rented from the owner of 625 Smithfield Street the fourth floor of that building, and then broke a doorway through the brick walls on the fourth floor of both buildings. They manufactured luggage in this fourth floor until 1943 when they gave up the lease. The testimony of these parties is to the effect that if there was a counter-

balance cable running along the wall of the fourth floor to the roof, that it must have been enclosed because they never saw it. They reoccupied the fourth floor for a short time in 1946.

The corporate defendant, successor to the partnership, in October 1946, purchased the 625 Smithfield Street building from the trustee for the owners. It used the fourth floor only as a storage room for merchandise. The other three floors were occupied by tenants and defendant company continued the employment of the trustee as its renting agent. The two partnership defendants, who practically owned all of the stock of the corporation, testified that they were never in the second and third floor at any time prior to the fire.

Joseph L. Mandel was the tenant in the third floor of 625 Smithfield Street from 1943 until after the fire. He used the room for the storage of electrical appliances in which business he was engaged as a retailer at another location. He came to the third floor on an average of three or four times a week. He stated that the old elevator shaft was not floored over on the third floor; that along the wall of the shaft there was suspended an elevator counterbalance attached to a cable that ran through a hole in the fourth floor; that this counterbalance was located in between two guides, and that at its base there was located a block of wood like a shelf, upon which the weight appeared to rest. This counterbalance was 3 feet long and 18 inches wide, but he did not mention its thickness. He was not asked, nor did he give any testimony concerning any alleged cable drum located near the ceiling of the third floor.

Pitacciato also testified that above the cable drum the joist and all wood in the area was charred after the fire.

The case was submitted to the jury on the law as set forth in A.L.I. Restatement of the Law of Torts, §345, which section was read to the jury as part of the instructions. That section reads as follows:

Page 946—Section 345—Dangerous Conditions Known to Possessor.

"A possessor of land is subject to liability for bodily harm caused by a natural or artificial condition thereon to others who are privileged to enter the land for a public or private purpose, irrespective of his consent, if he

"(a) knows that they are upon the land or are likely to enter it in the exercise of their privilege, and

"(b) knows of the condition and realizes that it involves an unreasonable risk to them and has no reason to believe that they will discover the condition or realize the risk, and

(c) fails to exercise reasonable care

"(i) to make the condition reasonably safe or

"(ii) to warn them of the condition and the risk involved therein."

The jury was instructed that although plaintiff was a public servant performing a governmental function at the time he was injured, that he was also an implied invitee in defendant's building, and that his assumption of risk did not include a dangerous condition that should have been known to defendant provided that the dangerous condition would have caused his injuries while in the building, if there had not been a fire as an intervening cause. At the end of the charge the jury was again instructed as follows:

"To recapitulate, members of the jury; if a reasonable inspection would not have disclosed this defect, if there was any defect, and the falling of this weight was the result of the fire and not because of its own weight on the fourth floor of the building at 625 as

claimed, but in fact this was nothing more than an unavoidable accident and that the injuries sustained by Mr. Mistelske were the result of duties he assumed when he accepted employment and was sworn in as a fireman—in such a situation your verdict would be in favor of the defendant. That is, you will have to find that he would have been injured irrespective of the fire if it did so happen that he was on the premises at the time he was injured and legally on the premises. If you do not find that, then your verdict would be in favor of the defendant. If, however, you find that a reasonable inspection would have disclosed that the anchorage of that cable on the joist holding up the fourth floor and from the drum on the fourth floor was inefficient and that it would have been discovered by reasonable inspection that this weight wasn't safely anchored on the cable so that its full weight, or part of its weight would be taken off the floor, and therefore a potentially dangerous condition arose, a hazardous condition, which would indicate that this floor would give way by reason of excessive weight, and that it could have been discovered by a reasonable inspection and that it did give way on this morning of December 18, 1947 without having anything to do with being brought about by reason of the fire that was raging in this building, that it would have given way even though there had been no fire on this particular morning— in such a situation you would have a right to reach a conclusion that the defendant company was negligent in not anticipating that this situation would have happened, and that therefore because this plaintiff was an implied invitee upon the premises and entitled to a reasonably safe place in the circumstances, a reasonably safe place for fighting a fire, reasonably safe as to nothing that the fire had anything to do with, that brought about the injury to him—then in such situation you could find a verdict in favor of this plain-

tiff to compensate him by incorporating these items we have heretofore mentioned to you."

At the completion of the charge counsel for the parties were asked, "Do counsel for either party have any suggestions for additions, corrections or amplifications"? Counsel for defendant stated he wished to take some special exceptions to the instruction on the law as it affected defendant, and was told that those exceptions would be allowed after the jury retired. After the jury retired counsel for plaintiff then stated:

"Mr. Bolte: The plaintiff excepts to the failure of the court to charge that if the defendants permitted an artificial dangerous condition to exist on the premises which became harmful through subsequent operation of natural forces that the plaintiff is entitled to recover."

It is now argued in the motion for a new trial that the failure to charge the jury on this phase of the law was fundamental error. It is contended that if such instructions were given the jury might have found that the fire was the result of natural forces, viz., spontaneous combustion. However there is not one scintilla of proof that the fire resulted from such a cause, and if it was material, it became the burden of plaintiff to submit such proof. No one was in a better position than plaintiff, through the fire department, to ascertain all of the surrounding circumstances leading up to the fire and the conditions that existed immediately after the fire was extinguished. As a matter of fact defendant was somewhat hobbled in preparing its defense and obtaining witnesses because the præcipe for the summons was not filed until December 6, 1949 —12 days before the statute of limitations would have run—and the complaint was not filed until February 17, 1950. A reading of the charge will disclose that in effect the jury was instructed that if the potentially hazardous condition was gradually becoming extra-

hazardous by reason of natural forces, plaintiff could recover. That part of the charge is as follows:

"However, members of the jury, if you find that a reasonable inspection would have disclosed that this alleged slab of steel was put in an upright position in such a way on the fourth floor of 625 that by reason of its own weight there would be a gradual weakening of the floor, and if you further find that the nails around that cable, as the cable left the drum, and as claimed by the plaintiff here—

"By the way, no one asked Mr. Mandel if there was ever any drum on the ceiling of the third floor. I can't find it in my notes. He, more than anyone else, would have known about that; but we take the case the way the lawyers develop it for us. If you do find that there was that drum from which the cable unwound and that it was the intent when the elevator was being abandoned that these large nails were put around that cable in the nature of a perch or anchorage so that the total weight of this counterweight would not be on the floor, and that an inspection would have disclosed that the cable was carrying the load and these nails were holding the cable against the joists so that the drum was doing nothing but that as time went on that perch would loosen because the wood dried out and because of the constant pull, that a reasonable inspection would have disclosed that and would have put the owners of the building on notice that the whole weight of this slab on the fourth floor was too big a load on that and that there would come a time when this slab would break through that floor by reason of its own weight and the action of the law of gravity and that it might have broken through on the morning that Mr. Mistelske and his buddies were hurt, even if there were no fire, then the defendants could be found to have been negligent, if they could have reasonably expected or anticipated it. And if you reach a con-

clusion that these defendants were negligent, eliminating the fire, because if the fire brought about the loosening of this cable, then Mr. Mistelske assumed that risk—but if you so find the defendants negligent by a preponderance of the evidence of the credible witnesses, then you should return a money verdict to compensate him."

Plaintiff complains that Pitacciato should have been permitted to give his opinion as to whether the alleged location of the counterbalance on the fourth floor created a hazardous condition. This witness was testifying about inert and inanimate objects, and concerning which the average jury would reasonably be well versed. In the circumstances opinion evidence was not only not necessary, but it would have been error to have permitted same. It was the jury's province to determine if an extrahazardous condition existed at and before the fire started. In any event plaintiff's expert engineer, Ferguson, was permitted to give opinion evidence based on the observations made by Pitacciato.

We find no merit in the contention that the verdict was against the weight of the credible evidence. All the Pennsylvania authorities cited by plaintiff's counsel have been carefully read, and we do not find among them any applicable decisions at variance with the charge of the court on the law that the jury was to apply after it had found the facts. It would therefore only prolong this rather lengthy opinion in analyzing these authorities and serve no useful purpose. It is our conclusion that there were no substantial errors in ruling on evidence, no fundamental error in the charge of the trial court, and that defendant company, having been awarded a verdict in its favor by the jury, following a fair trial, that this verdict should not be taken away from defendant. Plaintiff's motion for a new trial will be refused.